**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

JUDGES OF THE PROBATE COURT RETIREMENT FUND OF GEORGIA, Derivatively on Behalf of Nominal Defendant DXC TECHNOLOGY COMPANY,

Plaintiff

v.

MICHAEL J. SALVINO, JOHN SWEENEY, KENNETH P. SHARP, ROBERT F. DEL BENE, MUKESH AGHI, AMY E. ALVING, DAVID A. BARNES, RAUL J. FERNANDEZ, DAVID L. HERZOG, ANTHONY GONZALEZ, MARY KRAKAUER, KARL RACINE, IAN READ, DAWN ROGERS, MANOJ SINGH, CARRIE TEFFNER, AKIHIKO WASHINGTON, and ROBERT F. WOODS,

Defendants

and

DXC TECHNOLOGY COMPANY,

Nominal Defendant.

Case No. 1:24-cv-02144

**DEMAND FOR JURY TRIAL**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Judges of the Probate Court Retirement Fund of Georgia ("Plaintiff"), a beneficial shareholder of DXC Technology Company ("DXC" or the "Company"), brings this shareholder derivative action, on DXC's behalf, seeking relief under federal and state law for misconduct perpetrated by the current and former officers and directors of DXC identified below (collectively, the "Defendants") in connection with systemic failures of corporate governance and a pattern of public misstatements that have exposed the Company to significant harm and enormous potential

liability.[1] Plaintiff, through its counsel, has conducted an investigation into the facts supporting the allegations in this Complaint and believes discovery will elicit further evidentiary support for its allegations.[2]

## I. NATURE AND SUMMARY OF THE ACTION

1. DXC is a multibillion-dollar public company. Yet, DXC's chief executive officer was recently forced to admit, following years of rosy public disclosures to the contrary: (i) that DXC is "*a really not fully functional organization*"; (ii) that DXC's operational dysfunction dates back to the Company's formation in 2017; and (iii) that DXC will now need to spend hundreds of millions of dollars to remediate its dysfunction. How does a multibillion-dollar public company fester, unbeknownst to its own shareholders, as "*a really not fully functional organization*" for the better part of a decade? Only through a corporate governance failure of massive proportions. Through this action, Plaintiff seeks: (i) to hold DXC's senior corporate leaders accountable for that failure; and (ii) to ensure appropriate stewardship of the Company going forward.

2. DXC was formed in 2017 through a combination of two predecessor businesses: Computer Sciences Corporation ("CSC") and Hewlett Packard's Enterprise Services business ("HP-ES"). Thereafter, DXC acquired a number of additional businesses in an attempt to expand its capabilities and market reach. Initially, DXC acknowledged difficulties in achieving integration of these businesses and, as a result, reported outsized restructuring and transaction, separation, and integration ("TSI") costs. The successful integration of DXC's business into a coherent whole and a corresponding reduction in the Company's restructuring and TSI costs were described by DXC's

[1] While DXC is named as a nominal defendant, any reference to "Defendants" does not encompass the Company itself.

[2] Plaintiff's investigation included a review of publicly-available information, including filings by DXC with the United States Securities and Exchange Commission ("SEC"), securities analysts' reports about DXC, stock market data, and public statements by the Defendants.

corporate leaders as being of the utmost importance. Indeed, such an integration was at the core of a so-called "Transformation Journey" that Defendants consistently touted, from 2020 through early 2024, as the Company's single highest priority.

3. For years, Defendants told shareholders and the wider market, in unambiguous terms, that the Transformation Journey was succeeding. They represented that, as a result of successful restructuring and integration efforts, DXC was able to substantially reduce its restructuring and TSI costs while positioning the Company for profitable future growth. The Company's financial statements were consistent with this public story, reflecting diminishing expenditures and corresponding improvements in the Company's free cash flow.

4. Defendants' story was, however, not true. DXC had not made strides in achieving integration and becoming a coherent whole. In fact, the Company's internal reality was worse than anyone on the outside could have even suspected. Serious organizational dysfunction, including basic and rudimentary integration failures dating back to the initial combination of CSC and HP-ES, festered unaddressed for years. Simply put: restructuring and TSI costs were not reduced by successfully integrating DXC's businesses and thereby reducing the *need* for further such expenditures; instead, Defendants simply shelved the Transformation Journey that they touted publicly as DXC's highest priority, ignored the Company's integration needs, and thereby artificially reduced reported costs and created the façade of a successful integration.

5. That façade of success allowed DXC's officers to reap enormous compensation tied to DXC's reported financial metrics. Defendant Michael J. Salvino ("Salvino"), who served as the Company's CEO until December 2023, alone received more than *$90,000,000* for the years 2021 to 2023. This outsized compensation was awarded to Salvino for the purported success of the Transformation Journey. The façade of success also allowed DXC's directors to avoid scrutiny

and activism from DXC's shareholders, securing their reelections to the Board each year. It further allowed Defendants to juice the Company's short-term stock price, likewise insulating them from criticism and activism. To the same end, Defendants diverted billions of dollars of cash that could have been used for completing the Transformation Journey to instead enact a massive stock buy-back program at share prices already inflated by their fraud, to the significant long-term detriment of the Company.

6. Ultimately, however, Defendants' fraud could not be sustained. On May 16, 2024, during a contentious conference call with Wall Street analysts following disappointing financial results, DXC's CEO—Defendant Raul J. Fernandez ("Fernandez"), a longtime director who became CEO in 2024 following the departure of Salvino—was forced to admit DXC's "*previous restructurings did not set a real, clean, solid fully integrated baseline for profitable growth*." In fact, he was forced to concede that, contrary to Defendants' years of rosy public disclosures concerning the purported success of the Transformation Journey and corresponding reductions in necessary TSI expenditures, DXC was in reality "*a really not fully functional organization*."

7. Fernandez would later acknowledge that DXC's organizational dysfunction dated back all the way to the initial combination of CSC with HP-ES, explaining that basic integration tasks that "*should have been dealt with the first 100 days or the first 9 months*" still "*was not done*." The Company's CFO, Defendant Robert F. Del Bene ("Del Bene"), underscored this shocking reality by later stating that "*integrating the original companies that form DXC . . . was not done*." The Company contemporaneously disclosed that it would need to spend hundreds of millions of dollars in new expenditures to address DXC's integration and restructuring needs that Defendants had falsely claimed to be addressing for years prior.

8. The fallout from these admissions was swift and catastrophic. Analysts reacted with shock, sending DXC's stock price cratering to a low of $14.78 per share, down from 2021 highs in excess of $40 per share and reflecting the destruction of billions of dollars in shareholder value. Fitch downgraded its outlook for DXC's debt. Shareholders revolted and brought potent class action securities fraud claims against DXC in the United States District Court for the Eastern District of Virginia, where DXC is headquartered (the "Securities Class Action").[3] DXC faces enormous potential liability in connection with the Securities Class Action.

9. DXC and its continuing public shareholders should not be left holding the bag for Defendants' multi-year fraud and staggering failures of corporate governance. Defendants should be held personally accountable for the harm their misconduct has caused the Company. Plaintiff brings this action on DXC's behalf for purposes of achieving that accountability and ensuring appropriate governance at DXC going forward, as it attempts to move beyond this unfortunate chapter in its corporate history. The Defendants are current and former officers and directors of DXC who served at the helm of DXC during the fraud. Plaintiff asserts five categories of claims.

10. *First*, Plaintiff asserts state law claims for breach of fiduciary duty against all of the Defendants. Investors in a public company like DXC place their trust in the company's senior officers and directors to manage the company's business. The company's officers and directors, in return, must scrupulously observe fiduciary duties requiring them to manage the business in a responsible manner and communicate truthfully with their company's shareholders. Defendants, DXC's corporate leaders during the period of the fraud, utterly failed to live up to these duties. They instead permitted the Company to fester as "*a really not fully functional organization*" for the better part of a decade while acting affirmatively to conceal that troubling reality from their

[3] The Securities Class Action is captioned *Roofers' Pension Fund v. DXC Tech. Co.*, No. 1:24-cv-01351 (E.D. Va. filed Aug. 2, 2024).

own shareholders and the wider market. This massive failure of corporate governance amounts to a systemic breach of duty on the part of all of the Company's corporate leaders, for which they should be held accountable.

11. *Second*, Plaintiff asserts federal law claims under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against all of the Defendants. Section 10(b) prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. All Defendants issued false and misleading statements concerning the success of DXC's Transformation Journey or its purportedly sustainable reduction in TSI costs during the period of at least May 26, 2021 through May 16, 2024 (the "Relevant Period"), which caused the value of DXC common stock to be inflated. During the same period, DXC repurchased more than *$2.1 billion* of its own stock at prices as high as $39.10 and an average price of $27.79. Revelation of the Transformation Journey fraud caused the value of DXC stock to plummet far below the repurchase prices, reflecting an enormous loss of corporate value resulting from the Company's dubious use of billions in cash to enact the share repurchases at the inflated stock valuations generated by their fraud.

12. *Third*, Plaintiff asserts federal law claims under Section 14(a) of the Securities Exchange Act of 1934, and Rule 14a-9 promulgated thereunder, against the Defendants who served on the DXC Board at the times that the Board issued its 2022 and 2023 Annual Proxy Statements, through which the Board sought shareholder approval of the incumbent directors' own reelections and shareholder approval of the Company's compensation plans. Section 14(a) makes it unlawful to solicit shareholder approval by use of a proxy statement that is false or misleading with regard to any material fact. The 2022 and 2023 Annual Proxy Statements were false and misleading. They touted Defendants' false story of success in connection with the Transformation

Journey and concealed the true dysfunction festering at the Company, thereby securing the reelection of DXC's incumbent directors and approval of the Company's proposed compensation plans without meaningful shareholder scrutiny or activism. This resulted in continuation and perpetuation of the Company's fraud unbeknownst to shareholders.

13. *Fourth*, Plaintiff asserts state law claims for unjust enrichment against all Defendants. All of the Defendants received significant compensation from DXC during the period of the Transformation Journey fraud, with some Defendants receiving many millions of dollars for their purported service to the Company. Given Defendants' systemic failure to responsibly manage the corporation, the harm they have wrought to the Company, and their failures to communicate truthfully with shareholders, all of Defendants' compensation received from the Company, during at least the Relevant Period, should be returned to DXC.

14. *Fifth*, Plaintiff asserts state law claims for contribution and indemnification against all Defendants. DXC now faces significant liabilities as a result of the Defendants' misconduct, most notably in connection with the Securities Class Action. DXC itself, and by extension its continuing public shareholders, should not be forced to shoulder liabilities caused by the personal misconduct of the Defendants. The Defendants should be held personally responsible for all liabilities incurred by the Company and its shareholders as a result of their misconduct.

15. Plaintiff has filed suit on behalf of DXC without first demanding that the DXC Board itself take action to bring these claims. Any such demand would have been a purely futile act. DXC's current Board (the "Demand Board") includes ten members, nine of whom are Defendants. These nine directors, among other things, approved the Company's 2023 Annual Proxy Statement (the "2023 Proxy"). The 2023 Proxy included blatant misstatements designed to secure these directors' reelections, touting the Company's "*clear execution on our Transformation*

*Journey*" and the "*effectiveness of . . . our Transformation Journey*" while concealing the Company's true organizational dysfunction and that its recent façade of financial success was achieved by, in fact, shelving the Transformation Journey and artificially lowering restructuring and TSI costs by deferring necessary integration expenses into the future. Six of the nine members of the Demand Board likewise approved the Company's 2022 Annual Proxy Statement (the "2022 Proxy"), which included similar misstatements. The 2022 Proxy Statement, among other things, touted then-CEO Salvino's "*strong performance leading the Transformation Journey*."

16. As unambiguous participants in the misconduct this action seeks to remedy, these directors could not possibly be trusted to fairly and impartially consider any litigation demand. This action is, accordingly, appropriately brought by Plaintiff as a shareholder derivative action on the Company's behalf. Plaintiff was a shareholder during the Relevant Period and continues to beneficially own DXC stock today. Plaintiff brings this action to hold Defendants accountable, vindicate the interests of the Company and all of its shareholder owners, and improve DXC's corporate governance to position it for honest and sustainable growth going forward.

## II. JURISDICTION AND VENUE

17. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).

18. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant DXC is headquartered in this District, conducts business in this District, and several of the acts and omissions alleged herein occurred in substantial part in this District.[4]

## III. PARTIES

### A. Plaintiff

21. Judges of the Probate Court Retirement Fund of Georgia is an institutional investor that is, and has been since June 24, 2021, a beneficial owner of shares of DXC common stock.

### B. Nominal Defendant

22. Nominal Defendant DXC Technology Company ("DXC") is a Nevada corporation, with its corporate headquarters at 20408 Bashan Drive, Suite 231, Ashburn, Virginia. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC."

### C. Defendants

23. Defendant Michael J. Salvino ("Salvino") served as DXC's President and Chief Executive Officer ("CEO") from September 2019 until his resignation in December 2023, and then transitioned to an advisory role until he departed from the Company on March 31, 2024. He also served as Chairman of the Board from July 2022, and as a director on the Board from May 2019, until his December 2023 resignation. From 2021 to 2023, DXC paid Salvino more than $90,000,000 in salary, stock awards, and other compensation.

---

[4] Venue is also proper under the Company's By-Laws, as its choice of forum clause (typically requiring that litigation be filed in Nevada) specifically excludes cases that have federal claims like those asserted herein, stating in relevant part that the forum clause "shall not apply to suits brought to enforce any liability or duty created by the Exchange Act, or any other claim for which the federal courts of the United States have exclusive jurisdiction." DXC By-Laws, Article X, available at https://s27.q4cdn.com/120381974/files/doc_downloads/governance/DXC-Amended-and-Restated-Bylaws-effective-November-3-2022.pdf.

24. Defendant John Sweeney ("Sweeney") served as Vice President of Investor Relations between January 2021 to June 2024.

25. Defendant Kenneth P. Sharp ("Sharp"), former Executive Vice President and Chief Financial Officer ("CFO"), served from November 2020 until his resignation that took effect in June 2023. Thereafter, Sharp assisted with the Company's transition before leaving DXC in September 2023. From 2021 to 2023, DXC paid Sharp more than $17,000,000 in salary, stock awards, and other compensation.

26. Defendant Robert F. Del Bene ("Del Bene") has served as DXC's Executive Vice President and CFO since June 2023. Since joining DXC in 2023, the Company has paid Del Bene more than $6,000,000 in salary, stock awards, and other compensation.

27. Defendant Mukesh Aghi ("Aghi") served as a DXC director from April 2017 until July 2023. Aghi was Chairman of DXC's Compensation Committee from August 2019 to August 2021 and served on the Compensation Committee from May 2021 until July 2023. Between 2021 and 2023, DXC paid Aghi more than $900,000 in fees and stock awards.

28. Defendant Amy E. Alving ("Alving") served as a director on the DXC Board from April 2017 to July 2023. During the Relevant Period, Alving served on the Nominating/Corporate Governance Committee and was Chairwoman for the Risk Committee until August 2021. Alving was also on the Audit Committee between August 2021 and July 2023. From 2021 to 2023, DXC paid Alving more than $950,000 in fees and stock awards.

29. Defendant David A. Barnes ("Barnes") has served as a director on the DXC Board since August 2020. Barnes currently serves as Chairman of the Nominating/Corporate Governance Committee and has been on the Committee since 2022. He has also served on the Audit Committee since 2020. From 2021 to 2024, DXC paid Barnes over $1,200,000 in fees and stock awards.

30. Defendant Raul J. Fernandez ("Fernandez") has served as DXC's President and CEO since February 2024 and previously served as DXC's Interim President and CEO since Salvino's departure in December 2023. Fernandez has also served as a director on the DXC Board since August 2020, was Chairman of the Nominating/Corporate Governance Committee from July 2022 to at least July 2023, was on the Nominating/Corporate Governance Committee from at least August 2021 to at least July 2023, and was on the Compensation Committee from August 2020 to August of 2021. From 2021 to 2024, DXC paid Fernandez more than $10,000,000 in salary, fees, stock awards, and other compensation.

31. Defendant Anthony Gonzalez ("Gonzalez") has served as a director on the DXC Board since January 2023 and has served on the Compensation Committee from at least July 2023. From 2023 to 2024, DXC has paid Gonzalez more than $400,000 in fees and stock awards.

32. Defendant David L. Herzog ("Herzog") has served as DXC's Chairman of the Board since December 2023 and served as a director on the DXC Board since April 2017. Herzog has served on the Audit Committee from August 2020 to the present, as Audit Committee Chairman from at least August 2020 to August of 2022, and on the Compensation and Nominating/Corporate Governance Committees since July 2022. Herzog was previously Chairman of the Board from December 2019 to March 2020. From 2021 to 2024, DXC paid Herzog more than $1,600,000 in fees and stock awards.

33. Defendant Mary Krakauer ("Krakauer") served as a director on the DXC Board from March 2018 to July 2022. Krakauer served on the Risk Committee from at least August 2020 to August 2021 and on the Nominating/Corporate Governance Committee from August 2021 to July 2022. From 2021 to 2022, DXC paid Krakauer more than $640,000 in fees and stock awards.

34. Defendant Karl Racine ("Racine") has served as a director on the DXC Board and on the Nominating/Corporate Governance Committee since January 2023. Since joining the Board in 2023, DXC has paid Racine more than $450,000 in fees and stock awards.

35. Defendant Ian Read ("Read") served as Chairman of the Board from March 2020 until announcing his retirement in July 2022. From 2021 to 2022, DXC paid Read more than $850,000 in fees and stock awards.

36. Defendant Dawn Rogers ("Rogers") has served as a director on the DXC Board since March 2021 and on the Compensation Committee since at least August 2021. Since becoming a DXC director in March 2021, DXC has paid Rogers more than $1,000,000 in fees and stock awards.

37. Defendant Manoj Singh ("Singh") served as a director on the DXC Board from April 2017 to July 2022. Singh served as Chairman of the Nominating/Corporate Governance Committee from at least August 2020 to August 2021, on the Nominating/Corporate Governance Committee from at least August 2020 to July 2022, and on the Audit Committee from at least August of 2020 to August of 2021. From 2021 to 2022, DXC paid Singh more than $650,000 in fees and stock awards.

38. Defendant Carrie Teffner ("Teffner") has served as a director on the DXC Board since April 2022 and on the Audit Committee from at least July 2022 to the present. Since April 2022, DXC has paid Teffner over $700,000 in fees and stock awards.

39. Defendant Akihiko Washington ("Washington") has served as a director on the DXC Board since March 2021. Washington also has served as Chairman of the Compensation Committee since August 2021 and on the Nominating/Corporate Governance Committee until

August 2021. From 2021 to 2024, DXC paid Washington more than $1,100,000 in fees and stock awards.

40. Defendant Robert F. Woods ("Woods") has served as a director on the DXC Board since April 2017. Woods has served on the Audit Committee since at least August 2020, serving as Chairman of the Audit Committee since August 2021. From 2021 to 2024, DXC paid Woods more than $1,300,000 in fees and stock awards.

41. The individuals identified in ¶¶ 23–40 above are referenced collectively in this Complaint as the "Defendants." The subset of Defendants identified in ¶¶ 23–26 above, who served as corporate officers of DXC during the Relevant Period, are referenced collectively in this Complaint as the "Officer Defendants." The subset of Defendants identified in ¶ 23 and ¶¶ 27–40 above, who served as members of DXC's Board, are referenced collectively in this Complaint as the "Director Defendants."[5]

## IV. DXC'S FRAUDULENT "TRANSFORMATION JOURNEY"

### A. DXC Purports to Embark on a "Transformation Journey" Focused on Integration and a Reduction of Restructuring and TSI Expenses

42. DXC, a publicly-traded Nevada corporation, operates a business focused on helping global companies modernize information technology infrastructure, optimize data architectures, and deliver solutions across cloud environments. The Company touts its ability to manage the full spectrum of infrastructure, services, applications, and security networks that comprise its customers' IT systems, which it refers to as the "Enterprise Technology Stack."

43. DXC was formed on April 1, 2017, through the merger of CSC and HP-ES. Thereafter, DXC acquired several other companies and operations systems to help expand its

[5] Salvino and Fernandez each served both as a director and as an officer during the Relevant Period and are, accordingly, identified both as an Officer Defendant and a Director Defendant.

capabilities and market reach. In its early years, DXC struggled with integration of these various businesses and continuously incurred outsized restructuring and TSI expenses as a result. For example, for the fiscal year ending March 31, 2018, the Company incurred restructuring costs of $803 million. As the Company struggled, from its high in 2018 to September 2019, its stock price dropped by two-thirds.

44. In September 2019, Salvino was appointed as CEO. When Salvino took over, he conceived, developed, and began implementing what the Company billed as a "Transformation Journey" turnaround plan. The Transformation Journey included a core focus on optimizing the structure of the Company. The core goals of the Transformation Journey, in the words of the Company, included "*[o]ptimizing value to better serve our customers by eliminating confusion and complexity*" and "*[u]nlocking value by pursuing strategic alternatives, rationalizing our portfolio, and strengthening our balance sheet through our commitment to running a long-term sustainable business*."[6] An explicit goal of the Transformation Journey was to successfully reduce restructuring and TSI costs to provide a foundation for sustainable growth.[7]

**B. For Years, Defendants Manipulate DXC's Financials, Pump DXC's Stock Price, and Secure their Own Reelections by Touting the Success of their "Transformation Journey"**

45. Over the ensuing years, the Transformation Journey was consistently touted by Defendants as the core focus of DXC's corporate leaders. Beginning in 2021, the Company's Annual Reports on Form 10-K and Annual Proxy Statements issued to shareholders in connection with the Company's annual shareholder meetings were replete with references to the

---

[6] 2021 Annual Report at pgs. 2–3.

[7] DXC defines "restructuring costs" as "costs, net of reversals, related to workforce and real estate optimization and other similar charges." 2021 Annual Report at pg. 47. It defines "TSI costs" as "costs related to integration, planning, financing and advisory fees and other similar charges associated with mergers, acquisitions, strategic investments, joint ventures, and dispositions and other similar transactions." *Id.*

"Transformation Journey," which was cast as the overarching priority of the Company's leaders. The 2022 Proxy issued by the DXC Board, for example, stated unambiguously that successful execution of the Transformation Journey was the Company's "*highest priority*."[8]

46. Throughout the years following Salvino's appointment as CEO, Defendants did not merely represent that successful execution of the Transformation Journey was their top priority. They also consistently represented that it was, in fact, a success. The Company reported reduced restructuring and TSI costs and a corresponding increase in free cash flow. The Defendants consistently ascribed these improved metrics to successful execution of the Transformation Journey.

47. The Officer Defendants regularly emphasized the Transformation Journey and resulting, purportedly sustainable, reductions in restructuring and TSI costs in their communications with investors. For example, during a May 26, 2021 conference call with analysts to discuss the Company's earnings, Salvino highlighted "*the progress we are making on our transformation journey*" and stated that DXC had "*achieved our goal of $550 million of cost savings in FY 2021*." On the same call, Sharp added: "*one of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring and TSI costs*." Less than a month later, at DXC's annual Investor Day meeting with analysts on June 17, 2021, Sharp further underscored DXC's purported "*unyielding focus on reducing restructuring and TSI expenditures*," asserting again that "*[o]ne of our key initiatives to improve earnings power and ultimately drive free cash flow is to wind down our restructuring and TSI expenditures*."

48. Similarly, during DXC's November 3, 2021 conference call with analysts, Sharp stressed the importance of reducing restructuring and TSI costs, stating a "*key driver of improving*

[8] 2022 Proxy at pg. 62 (emphasis added).

*cash flow is to continue to reduce our restructuring and TSI spend*," and represented that DXC "*remain[ed] on track to reduce restructuring in TSI from an average of $900 million per year over the last four years to $550 million in FY 2022 and about $100 million in FY 2024.*" On the same call, Salvino affirmed that DXC's cost reductions, including "*shrinking restructuring and TSI costs*," were "*sustainable and a result of the operational work we are doing*." Touting the same story, Sweeney represented at the June 6, 2022 Baird Global Consumer, Technology, and Service Conference that "*you can really see the financial results of our transformation journey*," and he emphasized that "*throughout the transformation journey, we've instilled financial discipline; we strengthened the balance sheet; we've improved cash generation [and] capital efficiency; we've lowered . . . $1 billion a year spend in restructuring and TSI.*"

49. The DXC Board, including all of the Director Defendants, echoed this public story of reduction in TSI expenses through the Transformation Journey. In the Board's Annual Proxy Statements issued to DXC shareholders in connection with the Company's annual meetings of shareholders, the Board affirmed the Company's progress in executing the Transformation Journey and lauded the efforts of Salvino and his team. In the 2022 Proxy, the Board represented that it had "*taken steps to simplify our operating and financial structure, align our executive compensation to our Transformation Journey and improve corporate governance, putting DXC in a better place*" and lauded "*Mr. Salvino's strong performance leading the Transformation Journey.*" In the 2023 Proxy, the Board similarly represented that it was "*pleased with the Company's continued progress*" and that "*Mr. Michael J. Salvino . . . together with his leadership team, have demonstrated clear execution on our Transformation Journey*[.]"[9]

[9] Myriad other misstatements by the Defendants during the Relevant Period are detailed in Sections VI and VII of this Complaint, *infra*.

50. Further bolstering the façade of successful implementation of the Transformation Journey, the Defendants went so far as to deploy more than *$2 billion* worth of cash to repurchase the Company's own stock from the public markets, on the purported basis that the Company's leaders believed their stock was *undervalued*. This massive share repurchase program served as a sign of strength, signaling the Defendants' confidence in the success of their Transformation Journey. It also had the effect of augmenting the effect of their public statements in increasing the market price of the Company's stock.

51. The Defendants' public story served their short-term interests. The Company's stock price rose significantly, outpacing its industry peers—something that the Defendants consistently touted in their public communications. Meanwhile, the Director Defendants were consistently reelected at each annual meeting without any controversy or activism on the part of the Company's evidently satisfied public stockholders. This allowed the Director Defendants to maintain their plum directorships—part time jobs for which each received significant compensation in the hundreds of thousands and, in some cases, millions of dollars[10]—and avoid the controversy and stockholder activism likely to result had Defendants candidly apprised stockholders concerning the status of the Company's integration and restructuring efforts.

52. The Director Defendants' compensation, however, paled in comparison to the compensation received by the Officer Defendants. The Officer Defendants reaped truly enormous compensation, purportedly to reward them for their success in implementing the Transformation Journey. Salvino received more than $90,000,000 in total compensation from 2021 to 2023. During the same period, Sharp received more than $17,000,000 in total compensation and Del Bene

[10] *See* ¶¶ 27–40.

received more than $6,000,000 in total compensation.[11] Compensation on this scale would have been utterly unjustifiable, indeed unthinkable, had the Company's true condition been publicly disclosed.

### C. The Truth is Revealed: DXC Admits Publicly that the "Transformation Journey" was a Façade and Confesses that DXC is "*A Really Not Fully Functional Organization*"

53. Defendants' public story of success in implementing the Transformation Journey was a façade. In reality, DXC had not made strides in achieving integration and becoming a coherent whole. Serious organizational dysfunction, including basic and rudimentary integration failures dating back to the initial combination of CSC and HP-ES, festered unaddressed for years.

54. In simple terms, DXC had *not* reduced TSI costs by successfully integrating its businesses and thereby reducing the *need* for TSI expenditures. Rather, Defendants had simply shelved the Transformation Journey that they touted publicly as DXC's highest priority, ignored integration needs, and thereby artificially reduced reported TSI costs, artificially increased the Company's free cash flow metrics, and created the illusion of successful integration. Defendants' fraud was gradually revealed through a series of revelations beginning in August 2022.

55. First, after the market closed on August 3, 2022, DXC held a conference call with analysts to discuss its first-quarter 2023 earnings and operations. During the call, Sharp acknowledged that "*our cost optimization efforts have moved at a slower pace than anticipated as we were thoughtfully building our plan*." This disclosure led to a significant drop in DXC's stock price, with the trading price of DXC common stock falling by $5.37 per share, or 17%, from a closing price of $31.52 on August 3, 2022, to $26.15 on August 4, 2022. As noted above and

[11] Plaintiff has been unable to identify Defendant Sweeney's total compensation based on publicly-available information. Considering the enormous compensation received by his fellow executives, however, it was inferably significant.

further detailed below, however, Defendants continued to misrepresent their progress in transforming the Company and reducing restructuring and TSI costs even after this disclosure.

56. On March 14, 2023, the Securities and Exchange Commission charged DXC with making misleading financial disclosures in multiple earlier reporting periods from 2018 to early 2020. DXC had negligently misclassified "tens of millions of dollars" in expenses as adjustments for TSI costs, inflating its net income in three fiscal quarters. The SEC found that DXC's disclosure controls were inadequate, causing the company to mislead investors about its financial performance. DXC agreed to a cease-and-desist order, paid an $8 million penalty, and committed to improving its financial disclosure policies and procedures.[12]

57. On May 19, 2023, DXC announced that Sharp had resigned as CFO. He was replaced by Del Bene, becoming DXC's third CFO in less than three years.

58. Then, on December 20, 2023, after the market closed, DXC unexpectedly announced in a press release that Salvino had departed from his roles as CEO and Chairman of the Company effective December 18, 2023—indicating Salvino's performance had not been as exemplary as Defendants had previously suggested. Notably, in 2022 and 2023 DXC was approached by potential acquirers, and if Salvino had left in connection with such a change of control, he would have received $63.9 million in payments.[13] Instead, he received "just" $13.2 million, further indicating that the serious problems at DXC caused his abrupt departure. Following the news of Salvino's departure, DXC's stock price fell by $3.04 per share, or 12%, from a closing price of $25.03 on December 19, 2023, to $21.99 on December 20, 2023. As noted above and

---

[12] It is not known whether the SEC is presently investigating or taking other action with regard to more recent revelations concerning the falsity of DXC's disclosures during the Relevant Period alleged herein.

[13] "DXC Technology's Mike Salvino Out As CEO," *CRN*, by Joesph F. Kovar and David Harris (Dec. 20, 2023).

further detailed below, however, DXC continued to misrepresent its transformation efforts and the reduction of restructuring and TSI costs following this disclosure.

59. On February 1, 2024, DXC announced that the Board had appointed Defendant Fernandez as President and CEO of the Company, effective February 1, 2024. Thereafter, on May 16, 2024, Fernandez addressed the Company's operational challenges in his capacity as CEO during a contentious conference call with Wall Street analysts following DXC's reporting of disappointing quarterly financial results. In response to an analyst's question, Fernandez explained that, after "really [spending] a lot of time operationally looking at our systems [and] our processes," it became evident that "*the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth*."

60. In a remarkable series of unexpected disclosures, Fernandez went on to acknowledge that DXC had a "*number of systems still in place that were acquired over time [that were] never integrated, never deduped; [there were a] number of business processes that got stacked on top of each; [a] number of legal entities*." Fernandez further explained: "this is a real reset. It is bottoms up. It is a strong foundation to go from and it is absolutely needed, because otherwise, ***we'd just continue to carry a really not fully functional organization***." Contemporaneously, DXC also disclosed it would need to spend an additional *$250 million* to address the urgent, still unabated restructuring and integration needs identified by Fernandez. Following these disclosures, DXC's stock price dropped by an additional $3.36 per share, or nearly 17%, from $19.88 on May 16, 2024, to $16.52 on May 17, 2024.

### D. DXC Suffers Significant Harm and Faces Enormous Potential Liability as a Result of the "Transformation Journey" Fraud

61. All told, as a result of Defendants' false and misleading statements concerning the Transformation Journey and efforts to cut restructuring and TSI costs, DXC's stock price was cut

in half between the first and final corrective disclosures in August 2022 and May 2024, respectively, wiping out more than $2.4 billion in market value.

62. Significantly, the massive destruction in share value did not merely affect the public investors who had purchased DXC stock during the Relevant Period when the price of DXC stock was inflated by Defendants' misstatements. It also revealed the massive harm to the Company itself caused by Defendants' enactment of their more-than-$2 billion in share repurchases during the Relevant Period. As detailed in Section VI of this Complaint, *infra*, those repurchases had been effected at an average price in excess of $27.79 per share. That is, Defendants had caused the Company to overpay for its own stock by hundreds of millions of dollars—resulting in a loss of hundreds of millions of dollars from the corporate treasury that, notably, could have otherwise been spent actually working to accomplish the purported goals of the Transformation Journey in addressing the Company's urgent restructuring and integration needs.

63. The revelation of Defendants' fraud has also imperiled the interests of the Company going forward. Indeed, following the disastrous May 16, 2024 conference call, analysts issued harsh critiques of DXC's revelations and questioned its candidness. Guggenheim Securities highlighted management's admission of "missed opportunities" to fully integrate the companies forming DXC and noted this was the Company's third announced attempt to correct course in its short corporate history. RBC Capital raised similar concerns over yet another restructuring, questioning whether the business could be fixed at all. Deutsche Bank pointed out that DXC's newly announced restructuring included $250 million in additional costs, with guidance falling well below expectations for adjusted operating margins and free cash flow.

64. In investor conferences shortly thereafter, Fernandez and Del Bene acknowledged unambiguously that serious dysfunction continued to plague the Company—putting the lie to

Defendants' myriad statements, over many years, concerning the purported success of their Transformation Journey. Strikingly, at a JPMorgan Global Technology Conference on May 20, 2024, Fernandez admitted basic and rudimentary integration tasks that should have been accomplished early in DXC's history had remained unaddressed, allowing significant organizational dysfunction to fester for the better part of a decade. Fernandez admitted:

> [T]here are some things at least that I saw and I see and I'm working on right now ***that should have been done***. So, the turnaround or the restructurings that were done in, let's just say, the short seven-year history, right, as a standalone entity named DXC. ***There were five enterprise business systems when the first CEO took over, there were five when the second CEO took over, and there were five when the third CEO took over***. They're not going to be five at the end of my tenure. ***So, again, one thing that was basic should have been dealt with the first 100 days or the first 9 months was not done.***

65. Days later, at a TD Cowen conference on May 29, 2024, Del Bene echoed these sentiments, stating plainly that "***integrating the original companies that form DXC***, the heavy lifting on process, running common process, ***was not done***."

66. Fernandez and Del Bene's statements amounted to an admission that, despite Defendants' years of statements to the contrary, critical aspects of the Transformation Journey—including the integration of CSC and HP-ES and the streamlining of business systems and processes—were never undertaken. The reductions in restructuring and TSI expenses previously touted by the Defendants resulted not from *progress* in addressing the Company's integration and restructuring needs, but rather from utter *neglect* of those integration and restructuring needs.

67. The harm to the Company stemming from these failures was compounded when Fitch downgraded its outlook for DXC's debt in September 2024, citing continued revenue declines and uncertainty around the sustainability of cost-cutting and restructuring measures, indicating that DXC will face significantly increased borrowing costs going forward.

68. The Company is, moreover, now being forced to spend enormous sums of money to actually carry out the integration and organizational streamlining Defendants falsely claimed to be addressing, and succeeding in, for years during the Relevant Period.

69. On August 2, 2024, an institutional investor filed the Securities Class Action against DXC and the Officer Defendants alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, based on the course of events described herein. The Securities Class Action seeks to recover from DXC the massive losses sustained by shareholders as a result of their own purchases of DXC common stock at inflated prices during the Relevant Period, and appears likely to further compound the harm that the Company has already incurred.

70. Whether DXC will face additional liability as a result of the fraud, including potentially in connection with new governmental or other regulatory actions, remains to be seen.

## V. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO DXC

71. Investors in a public company like DXC place their trust in the company's senior officers and directors to manage the company's business. The company's officers and directors, in return, must scrupulously observe fiduciary duties requiring them to manage the business in a responsible manner and communicate truthfully with shareholders. As detailed below, Defendants utterly failed to live up to their duties in connection with the fraud alleged herein.

### A. Defendants Were Duty-Bound to Oversee DXC's Most Important Priorities, Responsibly Manage the Business, and Communicate Truthfully with Shareholders

#### 1. The Duties of All Defendants

72. By reason of their positions as senior officers and directors of DXC and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed DXC and its shareholders the highest duties of loyalty and care in the management and administration of the Company. Defendants were required to act in furtherance of the best interests

of DXC and its shareholders so as to benefit all shareholders and, to that end, were duty-bound to manage the Company in a responsible and prudent manner. Defendants were further duty-bound to communicate truthfully with the shareholders to whom they owed duties and on whose behalf they were entrusted to run the Company.

73. Because of their positions of control and authority as directors or officers of DXC, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint. Due to their positions with DXC, Defendants had knowledge of material non-public information regarding the Company, including with regard to the true status of the Company's publicly-undisclosed integration and restructuring failures.

74. To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company. By virtue of such duties, the officers and directors of DXC were required to, among other things:

(a) Manage, conduct, supervise, and direct the employees, businesses and affairs of DXC in a reasonable and responsible manner and in accordance with all laws, rules and regulations, and the charter and bylaws of DXC;

(b) Ensure that DXC did not engage in imprudent practices and that the Company complied with all applicable laws and regulations;

(c) Remain informed as to how DXC was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

(d) Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by DXC, and to examine and evaluate any reports of examinations or investigations concerning the practices or conduct of officers of the Company;

(e) Preserve and enhance DXC's reputation as befits a public corporation;

(f) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

(g) Refrain from unduly benefiting themselves and other DXC insiders at the expense of the Company.

**2. Specific Duties of the Director Defendants**

75. The Director Defendants, who held ultimate responsibility for overseeing the affairs of the Company as members of its Board, also had a number of more specific duties during the period of the fraud, which they failed to fulfill.

76. The Board and its committees were expressly charged with overseeing and monitoring specific aspects of DXC's business. The Company's 2022 Proxy stated: "*As part of its oversight responsibility, the Board oversees and maintains our governance and compliance processes and procedures to promote high standards of responsibility, ethics and integrity*."[14] With respect to risk oversight, the 2022 Proxy further stated: "*The Board has overall responsibility for oversight of risk and assessment of our strategic and operational risks throughout the year on an ongoing basis. Members of senior management regularly report on the opportunities and risks faced by us in the markets in which we conduct business*."[15]

77. Notably, during the Relevant Period, the Board was highly focused on the Company's Transformation Journey, which was conceived and developed by Defendant Salvino. The Company's 2022 and 2023 Proxies, issued by the Board, repeatedly highlighted the Transformation Journey as a core priority of the Company, with the 2022 Proxy stating unambiguously: "*During fiscal 2022, our highest priority was to work together as one team to execute the Transformation Journey*."[16] Therefore, execution and oversight of the Transformation

[14] 2022 Proxy at pg. 20.
[15] *Id.*
[16] 2022 Proxy at pg. 62 (emphasis added).

Journey—including its focus on addressing the Company's needs with regard to integration and restructuring—was unquestionably within the responsibility of the DXC Board.

78. Further, in fulfilling its oversight role, the Board delegates certain risk management oversight responsibility to the Board's three standing committees: the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance Committee. Each of these committees, under its respective committee charter, was assigned additional specific responsibilities relevant to oversight of the Transformation Journey.

**a. Audit Committee**

79. During the Relevant Period, Defendants Alving, Herzog, Barnes, Teffner, and Woods served on the Audit Committee. According to DXC's Audit Committee Charter, the role of the Committee is:

- to oversee the accounting, financial reporting processes and related internal control framework of the Company and audits of the Company's financial statements and internal control over financial reporting; [and]
- to assist the Board of Directors in its oversight of:
  - (a) the integrity of the Company's financial statements,
  - (b) the Company's compliance with legal and regulatory requirements,
  - (c) the independent auditor's qualifications and independence, and
  - (d) the performance of the Company's internal audit function and independent auditor[.][17]

80. More specifically, the Charter provides that the Audit Committee shall review:

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal

[17] *See* https://investors.dxc.com/governance/governance-documents/default.aspx.

controls and any special audit steps adopted in light of material control deficiencies; and

- analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements[.]

81. The Charter further provides that:

- The Committee shall meet to review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

- The Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and

- The Committee shall discuss the Company's policies with respect to risk assessment and risk management.

**b. Compensation Committee**

82. During the Relevant Period, Defendants Aghi, Fernandez, Herzog, Gonzalez, Rogers, and Washington served on the Compensation Committee. According to DXC's Compensation Committee Charter, the role of the Committee is:

- to assist the Board of Directors in determining the performance and compensation of the Chief Executive Officer and the compensation of the non-management directors;

- to discharge the responsibilities of the Board of Directors with respect to the compensation of other executives;

- to administer the Company's incentive stock plans[.][18]

83. The specific duties and responsibilities of the Compensation Committee include, in relevant part:

[18] *See* https://investors.dxc.com/governance/governance-documents/default.aspx.

- The Committee shall review and approve the corporate goals and objectives relevant to the Chief Executive Officer's compensation, evaluate his or her performance in light of those goals and objectives, and together with the other directors who are "independent" for purposes of the Company's Corporate Governance Guidelines (the "independent directors") determine and approve the Chief Executive Officer's compensation level based on this evaluation;

- The Committee shall review and approve the compensation of each person who is an executive officer of the Company for purposes of Section 16 of the Securities Exchange Act of 1934…;

- The Committee shall make recommendations to the Board of Directors with respect to establishment and amendment of incentive compensation plans and equity-based plans;

- The Committee shall oversee and review with management the Company's compensation risk in connection with the Company's executive and non-executive compensation programs; and

- The Committee shall administer the Company's Compensation Recovery Policy and any other Company policy that permits or requires the Company to recover erroneously awarded compensation.

**c. Nominating/Corporate Governance Committee**

84. During the Relevant Period, Defendants Alving, Herzog, Fernandez, Barnes, Racine, and Washington served on the Nominating/Corporate Governance Committee. According to DXC's Nominating/Corporate Governance Committee Charter, the role of the Committee is "to assist the Board of Directors in identifying and evaluating candidates for election or re-election as directors, and in shaping the corporate governance of the Company." More specifically, the Charter provides in relevant part:

- The Committee shall identify and recommend to the Board of Directors the slate of individuals to be nominated for election as directors at each Annual or Special Meeting of Stockholders at which directors are to be elected…; and

- The Committee shall recommend to the Board the directors to serve as members and chairmen of each committee of the Board, and assess and monitor the continuing qualification of directors to serve as members of such committees[.][19]

85. Each of these Committees, therefore, was charged with specific duties relevant to the oversight of the Company's financial condition and performance, and the performance of its executive leadership team. These duties required each Committee's members to remain intimately apprised of the status of the "Transformation Journey" and the Company's restructuring and integration efforts, and to ensure that those efforts were being caried out in a manner benefiting the Company and the interests of its shareholders.

### B. Defendants Breached their Duties by Allowing DXC to Become "A *Really Not Fully Functional Organization*" and Fraudulently Concealing that Reality from Shareholders

86. The Defendants, officers and directors of DXC during the period of the fraud alleged herein, utterly failed to live up to their duties to responsibly manage DXC and protect the interests of the Company and its shareholders.

87. For years, Defendants represented that the "Transformation Journey"—including its focus on integrating the various businesses that comprised DXC and winding down restructuring and TSI costs—was the central focus of DXC's corporate leaders. As noted, the Transformation Journey was so important that, in the Company's 2022 Proxy issued to shareholders, the Board described the Transformation Journey as its "*highest priority*." In the cover letter to the 2023 Proxy Statement, Salvino similarly touted ". . . *we have been laser focused on delivering on our transformation journey* . . ." In numerous proxy statements, annual reports, other filings with the Securities and Exchange Commission, earnings conference calls, and at securities

---

[19] *See* https://investors.dxc.com/governance/governance-documents/default.aspx.

analyst events, the Defendants consistently touted the paramount importance of—and the Company's success in executing—the Transformation Journey.

88. The Officer Defendants, as senior members of the Company's executive leadership team, were intimately involved in the day-to-day affairs of the business and personally responsible for executing the Transformation Journey. They breached their fiduciary duties to the Company by orchestrating the Transformation Journey fraud—*i.e.*, neglecting urgent integration and restructuring needs in order to artificially reduce restructuring and TSI costs, and working affirmatively to conceal that troubling reality from shareholders and the wider market by repeatedly making false and misleading public statements concerning the purported success of their efforts to execute the Transformation Journey.

89. Fernandez explained shortly after transitioning from being a Board member to becoming CEO as well, that "[a]s a director, you get a good sense of the business, its values and its challenges. . . ."[20] The Director Defendants, as members of DXC's Board with the ultimate authority and responsibility to manage the affairs of the corporation, were responsible for overseeing the Officer Defendants' work in implementing the Transformation Journey. Consistent with this responsibility, the Director Defendants repeatedly acknowledged publicly that they were actively overseeing the Transformation Journey and its success. Indeed, the Transformation Journey was so mission critical to the Company that, when the pandemic started the Board established a "Risk Committee" to provide ". . . oversight of the Company's activities in areas that were critical to the Company's strategic priorities during its *transformation journey*."[21] As

---

[20] "DXC Picks Interim CEO Raul Fernandez As Permanent Leader," *CRN*, by Joesph F. Kovar (Feb. 5, 2024).

[21] Inexplicably, the Board made the affirmative determination to disband the Risk Committee one year later, with the inevitable result that the risk it was designed to prevent came to fruition, causing enormous harm to DXC and its stockholders.

discussed above, the Board and its committee members were responsible for overseeing the Company's business, including the Transformation Journey at the core of its business. Moreover, they repeatedly represented that they were carefully and diligently overseeing the Transformation Journey.

90. Yet, after years of touting the success of the Transformation Journey and its importance to the Company, as well as touting their careful oversight of the Transformation Journey, the Company was forced to admit in May 2024 that the Defendants' previous statements concerning the success of the Transformation Journey were not true. Instead, the Company was "*a really not fully functional organization*," suffering from the effects of inexplicably neglected integration failures dating back to the original formation of the Company.

91. The Board breached its fiduciary duties to DXC in several striking ways.

92. *First*, a Board acting in good faith to discharge its fiduciary duties to the Company and its shareholders—and consistent with the Board's own guidelines and Committee charters—could not permit the Company to fester as "*a really not fully functional organization*" while failing to address the restructuring and integration needs purportedly at the core of the Transformation Journey. This is particularly true where, for years, the Transformation Journey was the highest priority of the Company and mission-critical to its current and future success. The Director Defendants breached their fiduciary duties by permitting this dysfunction to persist, unaddressed and concealed from the knowledge of the Company's shareholders, for years.

93. *Second,* a Board acting in good faith—and aware, as the Director Defendants were, of the Company's undisclosed organizational dysfunction—could not permit the Company to divert billions of dollars' worth of Company resources away from addressing that dysfunction to instead repurchase Company stock at prices that the Board knew were artificially inflated by the

fraud. The Director Defendants breached their fiduciary duties by doing just that: causing DXC to, during the Relevant Period, use more than $2 billion worth of DXC's cash to repurchase stock at artificially inflated prices—ultimately generating losses for the Company in the hundreds of millions of dollars as a result of those repurchases. Defendants' breaches of duty in connection with the share repurchases are further detailed in Section VI, *infra*.

94. *Third*, a Board acting in good faith could not make numerous statements touting the success of the Transformation Journey for years, when in fact the core goals of the Transformation Journey were being neglected in order to artificially improve the Company's short-term reported results. Indeed, a Board choosing to speak has an obligation to ensure their statements are accurate and truthful, and not false and misleading. Nor could a Board acting in good faith permit their Company's senior executives to repeatedly make false and misleading statements to shareholders and the wider market touting the success of the Transformation Journey. The Director Defendants breached their fiduciary duties by making numerous false and misleading statements to shareholders concerning the organizational health of the Company and the status of the Transformation Journey, including in the Board's annual Proxy Statements. The Director Defendants further breached their fiduciary duties by permitting the Officer Defendants to consistently make additional false and misleading statements to shareholders concerning the organizational health of the Company and the status of the Transformation Journey. The myriad misstatements made by the Defendants are further detailed in Sections VI and VII, *infra*.

## VI. DEFENDANTS VIOLATED SECTION 10(B) OF THE EXCHANGE ACT AND BREACHED THEIR DUTIES BY CAUSING THE COMPANY TO EFFECT BILLIONS OF DOLLARS IN STOCK REPURCHASES WHILE ISSUING FALSE STATEMENTS THAT ARTIFICIALLY INFLATED THE PRICE OF DXC STOCK

95. Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, prohibits any act or omission resulting in fraud or deceit in connection with the

purchase or sale of any security. All Defendants issued false and misleading statements concerning the success of DXC's Transformation Journey or its purportedly sustainable reduction in TSI costs during the period of at least May 26, 2021 through May 16, 2024 (*i.e.*, the Relevant Period), which caused the value of DXC common stock to be inflated. During the same period, DXC repurchased more than *$2.1 billion* of its own stock at prices as high as $39.10, with an average price of $27.79. Revelation of the Transformation Journey fraud caused the value of DXC stock to plummet far below the repurchase prices, reflecting an enormous loss of corporate value resulting from the Company's dubious use of billions in cash to enact the share repurchases at the inflated stock valuations generated by their fraud.

### A. Defendants Caused DXC to Conduct a Substantial Stock Repurchase Program at Inflated Prices During the Pendency of the "Transformation Journey" Fraud

96. Throughout the period of the fraud detailed herein, the Defendants caused DXC to enact more than $2 billion in share repurchases at prices that they knew were artificially inflated by the Defendants' public misstatements concerning the Transformation Journey.

97. DXC first announced the establishment of a $2 billion share repurchase program in April 2017. Then, on November 8, 2018, DXC approved an incremental $2 billion share repurchase. On February 2, 2022, DXC announced it would "self-fund $1 billion of additional share repurchases over the next twelve months." In the same release, Defendant Sharp highlighted DXC's "solid progress" restructuring the Company's TSI costs and "portfolio shaping efforts" that provided the "robust cash flows" to fund the program—eliding that the "robust cash flows" stemmed from the Company's *neglect* of its integration and restructuring needs. During a conference call held the same day, Defendant Sharp noted to investors that "we've been doing, right, share repurchases. We're pretty programmatic as far as timing and we stay pretty disciplined with it," and that "we think our stock is undervalued."

98. Throughout the Relevant Period, Officer Defendants Sharp, Salvino, Sweeney, and Del Bene repeatedly represented that DXC shares were "undervalued" and touted their "attractive valuation" in favor of the share repurchase program. For example, on a November 3, 2021 conference call with investors, Defendant Salvino explained, "*I look at how we're undervalued, and I say, okay, best use of the cash right now in the short term, buyback, all right, all while we continue to balance that investment-grade profile, okay?*" Speaking at a conference hosted by Baird Global on June 6, 2022, Sweeney tied the share repurchase program to the success of DXC's ongoing "journey": "*Throughout the transformation journey, we've instilled financial discipline; we strengthened the balance sheet; we've improved cash generation, capital efficiency; we've lowered, we used to have $1 billion a year spend in restructuring TSI; and we've started allocating capital, because we believe that our stock is undervalued.*"

99. On May 18, 2023, Defendants announced the completion of the prior $1 billion share repurchase authorization and a new $1 billion authorization, with Salvino highlighting "*[t]he clear execution on our transformation journey*" that "*delivered a better culture, stronger customers relationships, an improved sales model, revenue stability, expanded margins, free cash flow, and a solid investment grade credit profile, while returning $1 billion back to our shareholders.*" On a conference call with investors held the same day, Defendant Sharp again stressed that "[w]e continue to believe DXC presents an attractive valuation."

100. Two months later, at DXC's Annual Shareholder Meeting held on July 25, 2023, Salvino cited the Company's strategy as the reason "why our shareholders are supporting us in the execution of our transformation journey. We are returning value to them through our capital allocation strategy. In FY 2023, we returned $1 billion to our shareholders through share repurchases."

101. Accordingly, the Defendants' announcement and implementation of the share repurchase program clearly signaled to the market that DXC's "transformation journey" was proceeding successfully. In reality, however, that was not the case.

102. DXC ultimately repurchased approximately 81.7 million shares for a collective $2.195 billion during the relevant period at an average share price of $27.79 per share, as shown in the chart below:

| **Date of Repurchase** | **Shares** | **Average Price Per Share** | **Total Amount Paid** |
|---|---|---|---|
| May 2024 | None | | |
| April 2024 | None | | |
| March 2024 | 1,153,314 | $20.81 | $24,000,464.34 |
| February 2024 | 1,372,062 | $21.57 | $29,595,377.34 |
| January 2024 | 3,644,527 | $23.05 | $84,006,347.35 |
| December 2023 | 3,375,375 | $23.57 | $79,557,588.75 |
| November 2023 | 3,747,244 | $22.42 | $84,013,210.48 |
| October 2023 | 4,218,080 | $20.86 | $87,989,148.80 |
| September 2023 | 2,912,066 | $20.60 | $59,988,559.60 |
| August 2023 | 5,604,720 | $20.36 | $114,112,099.20 |
| July 2023 | 1,441,799 | $27.74 | $39,995,504.26 |
| June 2023 | 4,865,022 | $26.33 | $128,096,029.26 |
| May 2023 | 2,620,194 | $24.62 | $64,509,176.28 |
| April 2023 | 3,490,427 | $25.09 | $87,574,813.43 |
| March 2023 | 8,460,167 | $24.96 | $211,165,768.32 |
| February 2023 | 4,351,381 | $28.61 | $124,493,010.41 |
| January 2023 | 710,633 | $28.38 | $20,167,764.54 |
| December 2022 | 1,475,747 | $26.82 | $39,579,534.54 |
| November 2022 | 587,898 | $28.90 | $16,990,252.20 |

| Date of Repurchase | Shares | Average Price Per Share | Total Amount Paid |
|---|---|---|---|
| October 2022 | None | | |
| September 2022 | None | | |
| August 2022 | None | | |
| July 2022 | None | | |
| June 2022 | 605,800 | $34.40 | $20,839,520 |
| May 2022 | 4,814,532 | $29.40 | $141,547,240.80 |
| April 2022 | 3,430,580 | $30.32 | $104,015,185.60 |
| March 2022 | 4,461,217 | $31.14 | $138,922,297.38 |
| February 2022 | 2,619,956 | $36.16 | $94,737,608.96 |
| January 2022 | 1,119,994 | $33.36 | $37,362,999.84 |
| December 2021 | 4,205,032 | $31.19 | $131,154,948.08 |
| November 2021 | 2,550,523 | $31.95 | $81,489,209.85 |
| October 2021 | None | | |
| September 2021 | None | | |
| August 2021 | None | | |
| July 2021 | 2,112,212 | $39.10 | $82,587,489.20 |
| June 2021 | 1,750,000 | $38.52 | $67,410,000 |
| May 2021 | None | | |
| **TOTALS:** | **81,700,502** | **$27.79** | **$2,195,901,148.81** |

103. By causing DXC to conduct share repurchases, Defendants signaled to investors their purported belief that DXC shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up. Further, and relatedly, the Board's authorization of share repurchases artificially inflated the Company's financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares. The artificial inflation of DXC shares was financially and professionally beneficial to Defendants. Defendants Salvino and

Sharp's massive compensation was linked to the Company's financial performance, in particular the key metric of Free Cash Flow performance, and the Director Defendants touted the "clear execution" of the "transformation journey" in proxy statements seeking their re-election.

### B. In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements

104. Throughout the Relevant Period of May 26, 2021 through May 16, 2024—during which time Defendants were causing DXC to effect the massive share repurchases described above—Defendants repeatedly made false or misleading statements that artificially inflated the price of DXC common stock by: (1) concealing the dysfunction plaguing the Company as a result of its integration failures; (2) misrepresenting the success of the Transformation Journey; and (3) misrepresenting that TSI costs had been reduced through progress in the Company's integration and restructuring efforts rather than artificially reduced through neglect of those purported corporate priorities.

#### 1. Defendants Made False and Misleading Statements in 2021

105. On May 26, 2021, DXC reported its financial results for the fourth quarter and fiscal year 2021. During the Company's earnings call that day, Defendant Salvino "*highlight[ed] the progress we are making on our transformation journey*" and stated that "[w]e have achieved our goal of $550 million of cost savings in FY 2021. . . . We have done well optimizing our costs and continuing to deliver for our customers without disruption." On that same call, Defendant Sharp stated "[o]ne of our key initiatives we are employing to drive cash flow and improve earnings power is to wind down restructuring and TSI costs."

106. On May 28, 2021, DXC issued its Annual Report on Form 10-K. The Annual Report touted the Company's focus on the Transformation Journey and integration efforts, while

concealing the true nature of the Company's organizational dysfunction dating back to its initial formation in 2017.

107. On June 17, 2021, DXC held its annual Investor Day meeting with analysts. At that meeting, Defendant Sharp stated: "We are working to build a stronger financial foundation and drive the company in a disciplined and rigorous fashion to unleash our true earnings power." Defendant Sharp also stated: "*We have an unyielding focus on reducing restructuring and TSI expenditures*," and "[o]ne of our key initiatives we are employing to improve the earnings power and ultimately drive free cash flow is to wind down our restructuring and TSI expenditures."

108. On August 4, 2021, DXC reported its financial results for the first quarter of fiscal year 2022. During the earnings call for the quarter held the same day, Defendant Sharp stated: "*One of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring and TSI cost*." Defendant Sharp also stated: "*We will continue to make decisions to better position the company for the longer-term, creating a sustainable business*."

109. On September 9, 2021, Defendant Salvino attended the Deutsche Bank Technology Conference on behalf of DXC. During that conference, Defendant Salvino said that "*we're very confident that our—not only our playbook, but our transformation journey is absolutely working because we're continuing to stack up really good solid evidence with the hard data around it*."

110. On September 14, 2021, Defendant Salvino attended the Citi Global Technology Conference on behalf of DXC. During that conference, in response to a question about how DXC's current restructuring differed from prior restructuring efforts at DXC, Defendant Salvino responded, "We're running a very structured playbook . . . now, we're building the foundation for growth, meaning, simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there." Defendant Salvino went on to say, "Every quarter, we

continue to adjust the thinking of our business in terms of long-term stuff. So when you look at what we did, again, with free cash flow last quarter, we dealt with stuff that long-term is going to put us in a much, much better situation, all right[.]"

111. On November 3, 2021, DXC reported its financial results for the second quarter of fiscal year 2022. During the earnings call for the quarter held the same day, Defendant Sharp stated, "A key driver of improving cash flow is to continue to reduce our restructuring and TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business. . . . We remain on track to reduce restructuring in TSI from an average of $900 million per year over the last 4 years to $550 million in FY '22 and about $100 million in FY '24." Defendant Sharp also stated, "We are reaffirming our guidance for FY '24. *This reflects our strong execution in driving forward on our transformation journey*."

112. During the same call, Defendant Salvino stated, "Today's agenda will begin with an update on our Q2 performance, which shows hard evidence that we are delivering on our transformation journey and building the foundation to make DXC operationally efficient, sustainable and ultimately grow." Defendant Salvino also represented that reducing costs, including "*reduced debt, shrinking restructuring and TSI costs, increased margin and EPS and stronger free cash flow are all sustainable and a result of the operational work we are doing*. This gives us confidence that we will achieve our FY '24 double-digit margin guidance."

**2. Defendants Made False and Misleading Statements in 2022**

113. On February 2, 2022, DXC reported its financial results for the third quarter of fiscal year 2022. During the earnings call for the quarter held the same day, Defendant Sharp stated that "[o]ur transformation journey remains on track, with strong progress across all 4 key metrics. Organic revenue improved 100 basis points from Q2 to a decline of 1.4%. Adjusted EBIT margin

is up to 8.7%. Year-over-year, our adjusted EBIT margin expanded 170 basis points, while we substantially reduced our restructuring and TSI expense."

114. During the same earnings call, Defendant Sharp also stated, "*The execution of the transformation journey has made measurable improvement, allowing us to put the business on a firmer financial foundation, expanding margins and generating and keeping more cash,*" and "[w]e are reaffirming our guidance for FY '24. *This reflects our strong execution and driving forward on our transformation journey. Overall, we are making great progress driving efficiency in the business and generating strong free cash flow*."

115. On May 25, 2022, DXC reported its financial results for the fourth quarter of fiscal year 2022. During the earnings call for the quarter held the same day, Defendant Sharp said, "Turning to our progress on our transformation journey. There is no doubt we are in a much better place," and "[w]e are reaffirming our guidance for FY '24. This reflects our strong progress on our transformation journey and our belief in the company's capability to execute over the next 2 fiscal years."

116. During the same earnings call, Defendant Salvino stated, "In FY '22, we made excellent progress on our transformation journey, driving our financial performance and building a strong financial foundation."

117. On May 26, 2022, DXC issued its Annual Report on Form 10-K. The Annual Report touted the Company's focus on the Transformation Journey and integration efforts, while concealing the true nature of the Company's organizational dysfunction dating back to its initial formation in 2017.

118. On June 6, 2022, Defendant Sweeney attended the Baird Global Consumer, Technology, and Service Conference on behalf of DXC. During that conference, Defendant

Sweeney stated, "I'm going to take you through how DXC has been executing on the goals of its transformation journey. The company has made significant progress over the past couple of years, and it's now delivering strong financial results. As you'll hear today, we're really excited because we're just getting started. We think our solid financial performance and our improving business trajectory is going—and our improving business trajectory is going to continue for years to come based on how we currently manage the business." Defendant Sweeney went on to say, "In FY 2022, you can really see the financial results of our transformation journey" which "has changed the entire trajectory of the business. . . . [I]t's the execution of this program that stabilized DXC, and we believe, this is going to be our blueprint for future growth."

119. At the same Conference, Defendant Sweeney stated, "*Throughout the transformation journey, we've instilled financial discipline; we strengthened the balance sheet; we've improved cash generation, capital efficiency; we've lowered, we used to have $1 billion a year spend in restructuring TSI . . . [w]e continue to reduce our quarterly restructuring, transaction, separation and integration expense.*" Defendant Sweeney also stated: "[G]ot [] restructuring under control. In FY 2022, we reduced restructuring [and] TSI by $550 million in spending . . . *and that's sustainable, too* . . . [q]uarter in, quarter out, we were wading through all the sins of the past, and I think the real reason we've been able to do this is because we're down in the details and we're managing everything at a very low level. As we continue to work on a transformation journey, we believe that the structural changes we put in place and the ongoing focus we put at DXC are going to help us to generate and to hold on to more cash."

120. On June 13, 2022, Director Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods caused DXC to issue its 2022 Proxy in connection with DXC's 2022 annual meeting of shareholders held on July 26, 2022. The

2022 Proxy included myriad misstatements touting the purported success of the Transformation Journey while concealing the unaddressed integration and restructuring failures festering unbeknownst to Company shareholders. The myriad misstatements in the 2022 Proxy are detailed in Section VII.A, *infra*, concerning the Director Defendants' violations of Section 14(a) of the Securities Exchange Act of 1934.

121. On August 3, 2022, DXC reported its financial results for the first quarter of fiscal year 2023. During the earnings call for the quarter held the same day, Defendant Salvino said, "Our transformation journey is creating value, and we are confident that we are taking the right steps for DXC in the short term that will set us up for success longer term."

122. On November 3, 2022, DXC reported its financial results for the second quarter of fiscal year 2023. During the earnings call for the quarter held the same day, Defendant Salvino said, "Our Q2 results show that our transformation journey is back, producing the kind of results that we've grown accustomed to." Defendant Sharp also stated that "under our leadership, we have substantially driven down the TSI expense while increasing the related disclosures of these expenses." When asked a question by an analyst about "the free cash flow bridge" Defendant Sharp said that "looking to FY '24, certainly, the improved margins are a big piece of the cash uplift, the reduction of restructuring in TSI."

**3. Defendants Made False and Misleading Statements in 2023**

123. On February 1, 2023, DXC reported its financial results for the third quarter of fiscal year 2023. During the earnings call for the quarter held the same day, Defendant Salvino said, "*So now let me give you some additional color around our transformation journey, which is at the core of how we are creating these results,*" and "[o]ur clear execution of our transformation journey has built a quality company that you can depend on to deliver revenue that is not declining; change the mix of the revenue to the higher-value tech offerings of GBS; expand both margins and

EPS; win new work in the market as our offerings are relevant and in demand; generate strong free cash flow; manage our debt; and return cash to shareholders." Defendant Salvino also stated, "Our final step is our financial foundation, where we generated $463 million of free cash flow this quarter. The execution in this area was outstanding, and it gives us great momentum to hit our yearly guide for free cash flow."

124. During the same earnings call, Defendant Sharp said, "We continue to tightly manage restructuring and TSI expenses." In response to an analyst question about "free cash flow" and "the factors that drove the strong 3Q performance," Defendant Sharp said, "If you wind the clock back, the business had negative free cash flow. We've done a lot of work. Probably the biggest, you look at it now 2 years in a row of positive cash flow over $600 million. So it's really not lost on us, right? *A lot of good work from a lot of people across the entire business. The biggest driver, right, if you had to just kind of look holistically at the business has been the focus on driving down the restructuring in TSI.*"

125. On May 18, 2023, DXC reported its financial results for the fourth quarter of fiscal year 2023. During the earnings call for the quarter held the same day, Defendant Salvino said, "Our clear execution of our transformation journey by our talented team in FY '23 has delivered a better culture, stronger customer relationships, a better sales model, revenue stability, expanded margins and free cash flow, and we've maintained our investment-grade credit profile while returning $1 billion back to shareholders."

126. During the same earnings call, Defendant Sharp stated, "We continue to tightly manage restructuring and TSI expense. Our restructuring and TSI expense was $232 million for the year, $68 million lower than our guide. We have been focused on improving the quality of earnings and limiting this kind of non-GAAP adjustment."

127. On May 19, 2023, DXC issued its Annual Report on Form 10-K. The Annual Report touted the Company's focus on the Transformation Journey and integration efforts, while concealing the true nature of the Company's organizational dysfunction dating back to its initial formation in 2017.

128. On June 12, 2023, Director Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods caused DXC to issue its 2023 Proxy in connection with the 2023 annual stockholder meeting to be held on July 25, 2023. The 2023 Proxy included myriad misstatements touting the purported success of the Transformation Journey while concealing the unaddressed integration and restructuring failures festering unbeknownst to Company shareholders. The myriad misstatements in the 2023 Proxy are detailed in Section VII.B, *infra*, concerning the Director Defendants' violations of Section 14(a) of the Securities Exchange Act of 1934 in connection with the issuance of the 2023 Proxy.

129. On August 2, 2023, DXC reported its financial results for the first quarter of fiscal year 2024. During the earnings call for the quarter held the same day, Defendant Salvino stated, "While the execution of any transformation journey is never a straight line, we feel strongly that we are making the right long-term decisions to position DXC for success."

130. On November 1, 2023, DXC reported its financial results for the second quarter of fiscal year 2024. During the earnings call for the quarter held the same day, Defendant Del Bene stated, "Restructuring and TSI expense increased to $38 million, with the increase entirely due to the restructuring of facility leases part of our effort to rightsize our facility footprint. We are tightly managing restructuring, and we'll continue to evaluate opportunities to streamline our operations."

#### 4. Defendants Made False and Misleading Statements in 2024

131. On February 1, 2024, DXC reported its financial results for the third quarter of fiscal year 2024. During the earnings call for the quarter held the same day, Defendant Del Bene stated, "Free cash flow for the quarter was $585 million, the result of disciplined operational management and improving control of capital expenditures and working capital."

132. The statements set forth above in ¶¶ 105–131 were materially false and misleading. In truth, Defendants knew, or recklessly disregarded, that the Company had reduced its restructuring and TSI costs during the Relevant Period by curbing the Company-wide "transformation" and had simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring and integration that it claimed to be successfully addressing during the Relevant Period.

### C. DXC Relied on Defendants' False and Misleading Statements

133. Defendants caused the Company to purchase billions of dollars of its own stock in order to inflate DXC's stock price.

134. In repurchasing shares in connection with the stock repurchase program, DXC relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

135. Throughout the Relevant Period, DXC justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC. DXC would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.

Thus, reliance by DXC should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

136. Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.

137. At all relevant times, the market for DXC's common stock was efficient, for the following reasons, among others:

(a) DXC's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, DXC filed periodic reports with the SEC and the NYSE;

(c) DXC's common-stock trading volume was substantial on a daily basis, exceeding an average of over 4.25 million shares per day throughout the Relevant Period;

(d) DXC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) DXC was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public marketplace; and

(f) The market price of DXC's stock reacted rapidly to new information entering the market.

138. As a result of the foregoing, the market for DXC's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of DXC's stock. The foregoing facts indicate the existence of an efficient market for trading of DXC stock and support application of the fraud-on-the-market doctrine.

139. DXC relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

**D. Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations**

140. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about TSI costs and the progress DXC had made on its transformative journey.

141. Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of DXC or a Defendant who knew the statement was materially false or misleading when made.

**E. DXC was Harmed by Repurchasing Stock at Inflated Prices**

142. Throughout the Relevant Period, the price of DXC's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions

identified above. Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on DXC, which repurchased shares at artificially inflated prices. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of DXC stock fell as the prior artificial inflation dissipated. As a result of its purchases of DXC shares during the Relevant Period, the Company suffered damages under the federal securities laws.

143. After markets closed on August 3, 2022, investors first learned that the Company's "transformation journey" might have been sidetracked, or proceeding less successfully than previously touted, when DXC reported financial results for the fiscal first quarter of 2023 that RBC Capital analysts described as "lower than expected" driven by a "margin shortfall." The analyst specifically noted the "[m]anagement announced a $500M cost optimization initiative, which it believes will enable margins to improve." Still, RBC Capital analysts called the Company's proffered guidance "disappointing." During the related earnings call with analysts that day, former CFO Sharp acknowledged that "our cost optimization efforts have moved at a slower pace than anticipated." On these developments, the price of DXC stock fell 17% to close at $26.15 per share on August 4, 2022. More than $1.2 billion of investor value vanished.

144. Still, Defendants persisted in misrepresenting DXC's "transformation" and successful reduction in restructuring and TSI costs. For example, during a call with analysts held to discuss fiscal third quarter of 2023 earnings on February 1, 2023, analysts specifically asked what factors drove the Company's strong performance that quarter. Former CFO Sharp explained, "The biggest driver . . . has been the focus on driving down the restructuring and TSI." In subsequent earnings calls, Defendants continued to tout that they were "managing areas that we

can control very well, like free cash flow, and restructuring and TSI" and that they "continued to tightly manage restructuring and TSI expense."

145. Then, after markets closed on December 20, 2023, DXC issued a press release announcing that CEO and Chairman of the Board Salvino had abruptly left the Company, effective two days earlier. Board member Raul Fernandez was appointed Interim President and CEO. On this news, the price of DXC stock fell an additional 12% to close trading that day at $21.99 per share. On February 1, 2024, DXC announced Fernandez would serve as CEO going forward and was thus no longer interim CEO.

146. Just three months later, after markets closed on May 16, 2024, DXC held a call with analysts to discuss financial results for its fiscal fourth quarter of 2024. During the call, new CEO Fernandez announced that in order "to strengthen our market position, we are undertaking a restructuring initiative aimed at simplifying and enhancing our operational efficiency." Del Bene explained the restructuring program was necessary to "right-size our infrastructure throughout the Company to improve profitability." Later in the call, Del Bene explained that "impacting cash flow will be spending related to the increased level of restructuring, *which will be an increase of approximately $250 million year-to-year*." The first question for the executives during the call came from a Deutsche Bank analyst who asked the new CEO to "help us understand how your restructuring might be different than many of the CEOs that came before you that had a lot of restructuring as well?" In a stunning response, Fernandez acknowledged DXC had a "*number of systems still in place that were acquired over time [that were] never integrated, never deduped; [there were a] number of business processes that got stacked on top of each; number of legal entities*." Fernandez went on to explain, "*This is a real reset. It is bottoms up. It is a strong foundation to go from and it is absolutely needed, because otherwise, we'd just continue to carry*

*a really not fully functional organization*." On this news, the price of DXC stock declined a further 17% to close trading at $16.52 per share on May 17, 2024. Following the call, analysts issued scathing reports:

(a) Guggenheim noted: (1) "management's admission of 'missed opportunities in the past' to fully integrate the companies that formed DXC"; (2) the guidance "represents the company's third attempt at steering the ship in the proper direction"; and (3) a "turnaround of this scale is a material undertaking."

(b) RBC Capital highlighted that "New management is undertaking yet another restructuring," which poses "the question as to if this business can be fixed."

(c) In a report titled "Another CEO, Another Reset," Deutsche Bank reported that DXC's guidance "includes ~$250m costs from a newly announced restructuring," and "was well below expectations for [adjusted operating] margins and FCF, which was less than our est[imate]."

147. The dramatic decline in DXC's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market. The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by DXC were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VII. DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND BREACHED THEIR DUTIES BY ISSUING FALSE AND MISLEADING PROXY STATEMENTS IN CONNECTION WITH THE COMPANY'S 2022 AND 2023 ANNUAL MEETINGS OF SHAREHOLDERS

148. Section 14(a) of the Securities Exchange Act of 1934, and Rule 14a-9 promulgated thereunder, make it unlawful to solicit shareholder approval by use of a proxy statement that is false or misleading with regard to any material fact.

149. The Director Defendants violated Section 14(a) and SEC Rule 14a-9 by causing DXC to issue Annual Proxy Statements that failed to disclose that the Company's reduced restructuring and TSI costs had negatively impacted its Transformation Journey, ultimately

deferring costs that DXC would need to spend to implement a proper restructuring. Defendants omitted from DXC's 2022 and 2023 Proxies the material facts that the Defendants were making undisclosed changes to the Company's restructuring in order to inflate DXC's stock price and financial metrics, driving short-term performance. Defendants made false and misleading statements in DXC's 2022 and 2023 Proxies, including touting the "*progress we have made in driving our transformation journey*" and "*clear execution on our Transformation Journey.*" Defendants' failure to disclose these material facts and making false and misleading statements touting the Transformation Journey constitutes a breach of fiduciary duty as well as a violation of Section 14(a) and Rule 14a-9.

150. The Director Defendants' false and misleading disclosures in the Company's annual proxy statements are particularly troubling because those statements were designed to secure the Director Defendants' re-election to the Board and secure passage of shareholders' annual "say-on-pay" advisory vote on executive compensation.

151. Had the Board made accurate disclosures—that DXC's short-term focus on reducing restructuring and TSI costs would negatively impact the Company's overall restructuring efforts—shareholders would have had the ability to replace the Director Defendants and cast fully informed votes on executive compensation. Through their false and misleading disclosures and omissions, the Director Defendants deprived shareholders of their right to cast an informed vote and were able to retain their Board seats without a meaningful contested election—thereby allowing the continuation of DXC's corporate dysfunction and its continued concealment from DXC's shareholders and the wider market.

### A. Defendants Caused DXC to Issue Materially False and Misleading Statements in DXC's 2022 Annual Proxy Statement

152. On June 13, 2022, Director Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods caused DXC to issue its 2022 Proxy in connection with DXC's 2022 annual meeting of shareholders held on July 26, 2022.

153. Defendants Salvino and Read signed the cover letter to the 2022 Proxy, wherein they misleadingly proclaimed: "*We are pleased with the ongoing business momentum that we achieved in fiscal 2022 and with the progress we have made in driving our transformation journey. There is no doubt that DXC is in a better place.*"[22]

154. In the 2022 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicited votes, the Director Defendants issued materially false or misleading statements.

155. The 2022 Proxy depicts a Board that is skilled in the necessary areas for dealing with DXC's restructuring and integration issues. With respect to the ten directors that were up for election, the 2022 Proxy includes a "Board Skills Matrix" claiming that eight of these ten directors were skilled in the area of "Enterprise Transformation and Culture Building"—skills essential to the Company's Transformation Journey.[23]

156. Moreover, the 2022 Proxy states that the Board is responsible for overseeing management, maintaining integrity with financial statements, and reviewing and approving significant corporate actions—such as the Transformation Journey:

---

[22] 2022 Proxy, Opening Letter.

[23] Specifically, Director Defendants Aghi, Alving, Fernandez, Herzog, Rogers, Salvino, Teffner, and Washington were identified with "top skills" in Enterprise Transformation and Culture Building.

> [T]he Board's responsibilities include, but are not limited to:
>
> - overseeing the management of our business and the assessment of our business risks;
> - overseeing the processes for maintaining integrity with regard to our financial statements and other public disclosures, and compliance with law and ethics;
> - reviewing and approving our major financial objectives and strategic and operating plans, and other significant actions[.][24]

157. With respect to risk oversight, the 2022 Proxy stated:

> We believe our Board leadership structure supports a risk-management process in which senior management is responsible for our day-to-day risk-management processes and the Board provides oversight of our risk management. As part of its oversight responsibility, the Board oversees and maintains our governance and compliance processes and procedures to promote high standards of responsibility, ethics and integrity.
>
> * * *
>
> *Board Role.* The Board has overall responsibility for oversight of risk and assessment of our strategic and operational risks throughout the year on an ongoing basis. Members of senior management regularly report on the opportunities and risks faced by us in the markets in which we conduct business.[25]

158. The 2022 Proxy further noted that the Board "delegates certain risk management oversight responsibility to the Board's committees." It stated that the Audit Committee "oversees the accounting, financial reporting processes and related internal control framework of DXC and audits of the Company's financial statements and internal control over financial reporting, and discusses our policies with respect to risk assessment and risk management" and "also oversees the Company's enterprise risk management program and ethics and compliance program." The 2022 Proxy stated that the Compensation Committee's oversight responsibilities include ensuring

---

[24] 2022 Proxy at 17.

[25] *Id.* at 20.

"that the compensation and benefit programs are designed in a manner that aligns DXC's executive compensation program with the interests of DXC and its stockholders." It stated that the Nominating/Corporate Governance Committee "monitors the risks related to DXC's governance structure and process."[26]

159. The 2022 Proxy misleadingly suggested that the Board was properly skilled in overseeing the Company's restructuring and risk management and omitted any disclosures regarding: (i) the fact that the Company's reduced restructuring and TSI costs had negatively impacted its Transformation Journey, simply deferring costs that DXC would need to spend to implement a proper restructuring; (ii) the fact that the Board-approved compensation programs incentivized short-term performance above long-term value creation; and (iii) DXC's ineffective internal and disclosure controls.

160. The 2022 Proxy also urged stockholders to approve an advisory vote on executive compensation:

> In accordance with Section 14(a) of the Exchange Act, we are providing our stockholders the opportunity to approve, on a nonbinding, advisory basis, the compensation of our named executive officers as disclosed in this proxy statement. We urge the stockholders to read the CD&A appearing elsewhere in this proxy statement, as well as the 2022 Summary Compensation Table and related compensation tables and narrative, which provide detailed information on the compensation policies and practices and the compensation paid to our named executive officers in fiscal 2022, as well as compensation design considerations for fiscal year 2023.
>
> * * *
>
> We have determined that our stockholders should cast an advisory vote to approve the compensation of our named executive officers on an annual basis.[27]

---

[26] *Id.*

[27] *Id.* at 16.

161. With respect to the Company's executive compensation plan, the 2022 Proxy stated that DXC's "executive compensation program has been grounded in a pay for performance philosophy aimed at achieving strong alignment between the Company's financial and strategic goals and our stockholders' interests." The Proxy emphasized creating long-term value for stockholders:

- We believe that executive compensation should have a *significant portion of pay at-risk, be aligned to stockholder interests* and the *long-term value* realized by our stockholders through a balance of cash and equity.

- We believe that the majority of an executive's total target compensation should be variable and tied to achievement of measurable financial and strategic objectives that support the Company's business strategy. Performance measures are reviewed annually to ensure that we continue to *align our pay programs with our business strategy,* create sustainable value, and motivate the right behaviors….

- We believe that executive compensation should reflect an *appropriate mix* of short-term and long-term pay elements that make executives accountable for both short-term and long-term performance.[28]

162. Significantly, the Executive Compensation section of the 2022 Proxy explicitly linked executive compensation to the Company's Transformation Journey, with 23 references to "Transformation Journey," including the following excerpts:

- DXC's executive compensation program reflects our Transformation Journey turnaround strategy and aligns with our pay for performance philosophy.[29]

- Our executive compensation program is structured to align pay with performance by closely aligning leadership's financial interests with the execution of DXC's Transformation Journey turnaround strategy, long-term strategic goals, and value

[28] *Id.* at 52 (emphasis in original).

[29] *Id.* at 57.

creation for our shareholders.[30]

- We will continue to be responsive to our investors as we seek to maintain a highly performance-based executive compensation program that drives long-term value creation for our stockholders and supports DXC's Transformation Journey.[31]

- We've taken steps to simplify our operating and financial structure, align our executive compensation to our Transformation Journey and improve corporate governance, putting DXC in a better place.[32]

- Our executive compensation program is closely aligned with our strategic priorities, which include attracting and retaining a strong, experienced senior team focused on leading our Transformation Journey turnaround strategy. In alignment with our priorities, our executives are accountable for leading our people-first strategy, strengthening our customer relationships, and profitably and sustainably growing our business.[33]

- *Considering Mr. Salvino's strong performance leading the Transformation Journey turnaround strategy* and during the COVID-19 pandemic, in fiscal 2022, the Compensation Committee decided to increase his total compensation to bring it into line with the peer group median level, including increasing his base salary by 8%.[34]

163. The statements in the 2022 Proxy related to executive compensation misleadingly conveyed that DXC's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, DXC's compensation system actually encouraged—and consistently rewarded—the misconduct discussed herein. DXC's financial performance was based on artificially inflated financial metrics that resulted from reducing restructuring and TSI costs, negatively impacting the Transformation Journey, and deferring the

---

[30] *Id.* at 37.
[31] *Id.* at 38.
[32] *Id.* at 40.
[33] *Id.*
[34] *Id.* at 58 (emphasis added).

expenditures that DXC would need to make to implement a proper restructuring. The Board's deficient oversight failed to prevent or remedy this misconduct.

164. On the basis of the false and misleading 2022 Proxy, DXC shareholders voted in support of significant executive compensation, including compensation to Defendant Salvino which totaled over $20.3 million in 2023, causing damage to DXC.

**B. Defendants Caused DXC to Issue Materially False and Misleading Statements in DXC's 2023 Annual Proxy Statement**

165. On June 12, 2023, Director Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods caused DXC to issue its 2023 Proxy in connection with the 2023 annual stockholder meeting to be held on July 25, 2023. Similar to the 2022 Proxy, the 2023 Proxy connected the Company's success to the Transformation Journey.

166. The cover letter to the Proxy, signed by Salvino, misleadingly proclaimed: "*For the past three years, we have been laser focused on delivering on our transformation journey and investing significantly in our culture. I am proud of our results*."[35]

167. In the 2023 Proxy, the Director Defendants again solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicited votes, the Director Defendants issued materially false or misleading statements.

168. Like the 2022 Proxy, the 2023 Proxy depicts a Board with the requisite skills to deal with DXC's restructuring and integration issues. With respect to the eleven directors that were up for election, the 2023 Proxy includes a "Board Skills Matrix" claiming that eight of these

[35] 2023 Proxy, Opening Letter.

directors were skilled in the area of "Enterprise Transformation and Culture Building"—skills essential to the Company's Transformation Journey.[36]

169. Moreover, the 2023 Proxy states that the Board is responsible for overseeing management, maintaining integrity with financial statements, and reviewing and approving significant corporate actions—such as the Transformation Journey:

> [T]he Board's responsibilities include, but are not limited to:
>
> - overseeing the management of our business and the assessment of our business risks;
> - overseeing the processes for maintaining integrity with regard to our financial statements and other public disclosures, and compliance with law and ethics;
> - reviewing and approving our major financial objectives and strategic and operating plans, and other significant actions[.][37]

170. With respect to risk oversight, the 2022 Proxy stated:

> We believe our Board leadership structure supports a risk-management process in which senior management is responsible for our day-to-day risk-management processes and the Board provides oversight of our risk management in an integrated manner. As part of its oversight responsibility, the Board oversees and maintains our governance and compliance processes and procedures to promote high standards of responsibility, ethics and integrity.
>
> *Board Role*. The Board has overall responsibility for oversight of risk and assessment of our strategic and operational risks throughout the year. The Board (either directly or through reports from Board committees' chairs) receives a report at each regular meeting on the opportunities and risks facing DXC in the markets in which we conduct business, including on the assessment, monitoring and mitigation of risks material to the Company in the short, intermediate, and long-term, the effectiveness of the Company's

[36] Specifically, Director Defendants Fernandez, Herzog, Racine, Rogers, Rogers, Salvino, Teffner, and Washington were identified with "top skills" in Enterprise Transformation and Culture Building.

[37] 2023 Proxy at 19.

> control environment in managing these risks, the functioning of the Company's internal controls and procedures, and the identification and consideration of key emerging risks.[38]

171. The 2023 Proxy further noted that the Board "delegates certain risk management oversight responsibility to the Board's committees." The Audit Committee "oversees the accounting, financial reporting processes and disclosure controls and procedures, and related internal control framework of DXC and audits of the Company's financial statements and internal control over financial reporting, and discusses our policies with respect to risk assessment and risk management. The Audit Committee also oversees the Company's enterprise risk management (ERM) program and ethics and compliance program." The Compensation Committee's oversight responsibilities include ensuring "that the compensation and benefit programs are designed in a manner that aligns DXC's executive compensation program with the interests of DXC and its stockholders." The Nominating/Corporate Governance Committee "monitors the risks related to DXC's governance structure and process."[39]

172. The 2023 Proxy misleadingly suggested that the Board was properly skilled in overseeing the Company's restructuring and risk management and omitted any disclosures regarding (i) the fact that the Company's reduced restructuring and TSI costs had negatively impacted its Transformation Journey, simply deferring costs that DXC would need to spend to implement a proper restructuring; (ii) the fact that the Board-approved compensation programs incentivized short-term performance above long-term value creation; and (iii) DXC's ineffective internal and disclosure controls.

173. The 2023 Proxy also urged stockholders to approve an advisory on executive compensation:

---

[38] *Id.* at 22.

[39] *Id.* at 22-23.

> In accordance with Section 14(a) of the Exchange Act, we are providing our stockholders the opportunity to approve, on a nonbinding, advisory basis, the compensation of our named executive officers as disclosed in this proxy statement. We urge the stockholders to read the CD&A appearing elsewhere in this proxy statement, as well as the 2023 Summary Compensation Table and related compensation tables and narrative, which provide detailed information on the compensation policies and practices and the compensation paid to our named executive officers in fiscal 2023, as well as compensation design considerations for fiscal year 2024.
>
> * * *
>
> We have determined that our stockholders should cast an advisory vote to approve the compensation of our named executive officers on an annual basis.[40]

174. With respect to the Company's executive compensation plan, the 2023 Proxy stated that DXC's "executive compensation program has been grounded in a pay for performance philosophy aimed at achieving strong alignment between the Company's financial and strategic goals and our stockholders' interests." The Proxy emphasized creating long-term value for stockholders:

> - We believe that executive compensation should have a *significant portion of pay at-risk, be aligned to stockholder interests* and the *long-term value* realized by our stockholders through a balance of cash and equity.
>
> - We believe that the majority of an executive's total target compensation should be variable and tied to achievement of measurable financial and strategic objectives that support the Company's business strategy. Performance measures are reviewed annually to ensure that we continue to *align our pay programs with our business strategy,* create sustainable value, and motivate the right behaviors….
>
> - We believe that executive compensation should reflect an *appropriate mix* of short-term and long-term pay elements that make executives accountable for both short-term and long-term

[40] *Id.* at 17.

performance.[41]

175. The Executive Compensation section of the 2023 Proxy contained a number of references to the Company's Transformation Journey, including:

- *We are pleased with the Company's continued progress in fiscal 2023. Mr. Michael J. Salvino, our Chairman, President and CEO, together with his leadership team, have demonstrated clear execution on our Transformation Journey* and delivered a better culture, stronger customer relationships, an enhanced sales model and improved financial performance.[42]

- DXC's executive compensation program reflects our Transformation Journey turnaround strategy and aligns with our pay for performance philosophy.[43]

- Under Mr. Salvino's leadership, DXC's 3-year cumulative TSR *(113.7%)* substantially outperformed the median of the GICS 4510 Software and Services industry (25.4%). *We believe that this relative outperformance demonstrates the effectiveness of the five steps of our Transformation Journey, which is now embedded in how we operate.*[44]

- The Compensation Committee set the performance levels with the timeline for the Transformation Journey in mind. It utilized compound annual growth rates (CAGRs) and corresponding stock price growth hurdles requiring successful execution of steps on the Transformation Journey, as evidenced by significant financial and operating performance achievement and corresponding translation to stock price performance.[45]

176. The statements in the 2023 Proxy related to executive compensation misleadingly conveyed that DXC's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, DXC's compensation system actually encouraged—and consistently rewarded—the misconduct discussed herein. DXC's financial

[41] *Id.* at 51 (emphasis in original).
[42] *Id.* at 41 (emphasis added).
[43] *Id.* at 55.
[44] *Id.* at 48 (emphasis added).
[45] *Id.* at 63.

performance was based on artificially inflated financial metrics that resulted from reducing restructuring and TSI costs, negatively impacting the Transformation Journey, and deferring the costs that DXC would need to spend to implement a proper restructuring. The Board's deficient oversight failed to prevent or remedy this misconduct.

177. On the basis of the false and misleading 2023 Proxy, DXC shareholders voted in support of significant executive compensation, including compensation to Defendant Salvino which totaled over $19.8 million in 2024, causing damage to DXC.

## VIII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

178. Plaintiff is a current beneficial owner of DXC common stock and was a beneficial owner of DXC common stock during the period of Defendants' wrongful course of conduct alleged herein. DXC is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

179. Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by DXC as a direct result of the breaches of fiduciary duty and other violations of law alleged herein. Plaintiff will adequately and fairly represent the interests of DXC in enforcing and prosecuting its rights and has retained competent counsel with significant experience prosecuting shareholder derivative actions. Prosecution of this action, independent of the DXC Board, is in the best interests of DXC.

180. The DXC Board at the time of the filing of this action (the "Demand Board") consisted of the following ten directors: (i) Defendant Herzog, (ii) Defendant Fernandez, (iii) Defendant Barnes, (iv) Defendant Gonzalez, (v) Defendant Racine, (vi) Defendant Rogers, (vii) Defendant Teffner, (viii) Defendant Washington, (ix) Defendant Woods, and (x) non-Defendant Pinkie Mayfield (who joined the Board in 2023, after the issuance of the 2023 Proxy and 2023

Annual Report). Accordingly, nine of the ten members of the Demand Board are Defendants in this action.

181. In addition to being a Board member, Fernandez is the current president and CEO of DXC, is not designated as independent, and therefore further lacks independence to evaluate actions against the Board that oversees his employment.

182. Plaintiff has not made any demand upon the DXC Board to bring an action on behalf of DXC asserting the claims herein because such demand would have been a purely futile act, and is therefore excused, for the reasons stated herein.

183. Each of the Director Defendants served on the Board at the time of the wrongful course of conduct alleged herein and, accordingly, face a substantial threat of liability in connection with the prosecution of this action.

184. *First*, DXC's Directors represented that the "Transformation Journey" was at the very center of DXC's business and success. For example, it was so important that the cover letter of the 2023 Proxy touted ". . . *we have been laser focused on delivering on our transformation journey*," and the 2022 Proxy described it as the Board's "*highest priority*." The 2023 Proxy further lauded the Company's "*clear execution of our Transformation Journey*" which "*improved the quality of our revenue and margin and continued to strengthen our financial foundation*." The Defendants, in the Companies' annual reports on Form 10-K, consistently featured the Transformation Journey in the first item describing the business, emphasizing that "*[t]he Company will continue to focus on execution of its transformation journey[.]*" Given the mission critical nature of the Transformation Journey and its central importance to DXC, and Fernandez's admission that "[a]s a director, you get a good sense of the business, its values and its challenges," it is not possible that the Board members could not have known that, in actuality, the

Transformation Journey was being neglected, that acquired companies were "*never integrated*," and that the Company was "*a really not fully functional organization*."

185. *Second*, a Board acting in good faith—and consistent with the Companies' own guidelines and charters—could not have provided the good faith oversight it repeatedly claimed it was providing, when in fact the Transformation Journey was being neglected, companies acquired where "*never integrated*," and the Company was "*a really not fully functional organization*." This is especially so as the Board in 2020 recognized the need for a Risk Committee to provide "oversight of the Company's activities in areas that were critical to the Company's strategic priorities during its transformation journey" and then made the affirmative determination to disband the Risk Committee in August 2021, with the inevitable result of enormous harm to the Company and its stockholders. Similarly, the Board knew during the Relevant Period that there was an ongoing SEC investigation related to DXC's accounting treatment and financial disclosures for "transaction, separation, and integration-related costs" from a prior merger. This should have further highlighted the risks the Board and the Audit Committee members were required to oversee, yet the Board and Audit Committee utterly failed to properly oversee these matters.

186. *Third*, each Director Defendant approved, authorized, and permitted false and misleading statements touting the success of the Transformation Journey for years, when in fact the Transformation Journey was a complete failure. Indeed, a Board choosing to speak has an obligation to ensure their statements are accurate and truthful, and not false and misleading.

187. *Fourth*, each Director Defendant approved and authorized false and misleading statements touting their own oversight of the Transformation Journey for years, when in fact they knew they were not providing proper oversight over the Transformation Journey.

188. *Fifth*, each Director Defendant approved and authorized share repurchases at artificially inflated prices during the Relevant Period, thereby diverting enormous amounts of the Company's cash away from urgent operational needs and towards repurchases that ultimately caused significant financial harm to the Company.

189. The Defendants signed, authorized and/or issued multiple SEC filings that contained false and misleading statements. At the time the 2022 Proxy was issued by and on behalf of the Board, Defendants Aghi, Alving, Herzog, Fernandez, Barnes, Rogers, Teffner, Washington, Woods, and Salvino were members of the Board. The 2022 annual report, filed on Form 10-K, is signed by Director Defendants Aghi, Alving, Herzog, Fernandez, Barnes, Read, Rogers, Teffner, Washington, and Woods, and Officer Defendants Salvino and Sharp.

190. At the time the 2023 Proxy was issued by and on behalf of the Board, Defendants Herzog, Fernandez, Barnes, Gonzalez, Racine, Rogers, Teffner, Washington, Woods, and Salvino were members of the Board. The 2023 annual report, filed on Form 10-K, is signed by Board Defendants Aghi, Alving, Herzog, Fernandez, Gonzalez, Barnes, Racine, Rogers, Teffner, Washington, and Woods, and Officer Defendants Salvino and Sharp.

191. Each Defendant breached their fiduciary duties to DXC, and their breaches of duty involved intentional misconduct, fraud, or a knowing violation of law.

192. Given these factors, Demand on the Board would be futile.

## IX. CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Against The Officer Defendants)

193. Plaintiff incorporates by reference and realleges each of paragraphs 1 through 192 as if fully set forth in this paragraph.

194. This Count is brought against Defendants Salvino, Sweeney, Sharp, and Del Bene solely in their capacity as officers.

195. The Officer Defendants owed fiduciary duties to DXC and its stockholders. By reason of their fiduciary relationship, the Officer Defendants specifically owed DXC the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including with respect to the Transformation Journey, financial reporting, internal controls, compensation practices, and to make accurate and truthful public statements.

196. The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by, among other things, either intentionally causing the Company to fail to properly carry out the Transformation Journey, reducing restructuring and TSI expenditures that negatively affected its Transformation Journey, and issuing false statements.

197. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

198. As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, DXC has sustained and continues to sustain significant damages.

199. As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT II
## Breach of Fiduciary Duty
## (Against The Director Defendants)

200. Plaintiff incorporates by reference and realleges each of paragraphs 1 through 192 as if fully set forth in this paragraph.

201. Each of the Director Defendants owed and owe fiduciary duties to DXC and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe DXC the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

202. Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to DXC and its stockholders in at least the following ways:

(a) Failing to properly oversee the Transformation Journey;

(b) Permitting organizational dysfunction to fester unaddressed and concealed from shareholders for years;

(c) Approving the Company's repurchase of DXC shares at a time when the shares were artificially inflated;

(d) Structuring the Company's compensation policies so that Company executives were lavishly rewarded for purported success related to the Transformation Journey, when in fact the Transformation Journey was being neglected or was a total failure; and

(e) Allowing DXC's false and misleading public statements pertaining to the Transformation Journey and reducing restructuring and TSI expenditures.

203. Defendants, individually and in concert, engaged in the above-referenced conduct in breach of the fiduciary duties they owed to DXC to protect its rights and interests.

204. In breach of their fiduciary duties owed to DXC, Defendants willfully participated in misrepresentations related to the Company's Transformation Journey, reducing restructuring and TSI expenditures that negatively affected its Transformation Journey, and other issues, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors, rendering them personally liable to the Company for breaching their fiduciary duties.

205. Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the status of the Transformation Journey and the Company's financial condition, and they failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

206. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207. Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

208. Plaintiff's claims are not subject to an exculpatory provision. As detailed in this Complaint, the Director Defendants' misconduct involved: (i) breaches of their duty of loyalty; (ii) acts or omissions that involved intentional misconduct, fraud, or a knowing violation of law; and (iii) personally benefitting themselves.

209. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, DXC has sustained and continues to sustain significant damages. As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company

**COUNT III**
**Violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**
**(Against All Defendants)**

210. Plaintiff incorporates by reference and realleges each of paragraphs 1 through 192 as if fully set forth in this paragraph.

211. During the Relevant Period, the Defendants disseminated or approved false or misleading statements about DXC as detailed above, including those detailed in paragraphs 105-131 of the Complaint, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and the Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

212. At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Defendants, the Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to the Defendants' false or misleading statements. The Defendants engaged in a scheme to defraud DXC by causing the Company to purchase millions of shares of DXC at artificially inflated prices, as detailed above.

213. The Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon DXC in connection with the Company's purchases of DXC stock during the Relevant Period.

214. The Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a

continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of DXC stock, which were intended to, and did: (a) deceive DXC related to the Company's acquisition integration plan referred to as the Transformation Journey, reducing restructuring and TSI expenditures that negatively affected its Transformation Journey, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of DXC stock; and (c) cause DXC to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, the Individual Defendants were in possession of material, adverse non-public information regarding the Transformation Journey.

215. Defendants were the senior executives and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made, as alleged above.

216. As described above, the Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

217. The Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

218. As a result of Defendants' misconduct, DXC has and will suffer damages in that it paid artificially inflated prices for DXC common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the Company's Transformation Journey were fully disclosed on May 16, 2024. DXC would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

219. As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of DXC stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

220. Plaintiff brings this claim within two years of the discovery of the violation and within five years of the violation.

**COUNT IV**
**Violation of §14(a) of the Securities Exchange Act of 1934 and Rule 14a-9**
**(Against the Director Defendants)**

221. Plaintiff incorporates by reference and realleges each of paragraphs 1 through 192 as if fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants.

222. SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

> which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

223. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the Company's 2022 and 2023 Proxies, as identified in paragraphs 148-177 of the Complaint. These Proxies contained proposals to DXC shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies contained false and misleading statements concerning (i) the true condition of the Company's Transformation Journey; (ii) the "successful" Transformation Journey, when in fact the Transformation Journey was a failure; (iii) that the Board was actively involved in the oversight of risks, which would include due diligence for the previously acquired entities; (iv) that Board-approved compensation structures properly rewarded Company executives for successful execution of the Transformation Journey, when in fact the Transformation Journey was being neglected or a failure; and (v) portraying the Transformation Journey as a success.

**COUNT V**
**Unjust Enrichment**
**(Against All Defendants)**

224. Plaintiff incorporates by reference and realleges each of paragraphs 1 through 192 as if fully set forth in this paragraph.

225. During the Relevant Period, the Defendants received bonuses, stock options, stock, or similar compensation from DXC that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct.

226. Plaintiff, as a stockholder and representative of DXC, seeks restitution from the Defendants and seeks an order of this Court disgorging all profits, benefits, and other

compensation—including any salary, options, performance-based compensation, and stock—obtained by the Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT VI
## Contribution and Indemnification
## (Against All Defendants)

227. Plaintiff incorporates by reference and realleges each of paragraphs 1 through 192 as though fully set forth herein.

228. DXC is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to DXC, including in connection with the Securities Class Action.

229. DXC's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and DXC is entitled to contribution and indemnification from each Defendant in connection with all such claims that have been, or may in the future be asserted against, DXC by virtue of the Defendants' misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. A determination that this action is a proper derivative action maintainable under the law and that demand was rejected and/or the Board is incapable of conducting a fair and impartial investigation;

B. Declaring that Defendants (i) have breached their fiduciary duties to DXC; (ii) have violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (iii) have violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder (as to the Director Defendants); and (iv)

were unjustly enriched, and are liable for contribution and indemnification, on account of these wrongful acts;

C. Determining and awarding to DXC the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D. Directing DXC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint;

E. Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of DXC, has an effective remedy;

F. Awarding to DXC restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

G. Ordering an accounting of all compensation awarded to the Defendants during the Relevant Period;

H. Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I. Awarding such other relief as this Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 27, 2024

By: *___/s/ Steven J. Toll____________*
Steven J. Toll (Va. Bar No. 15300)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com

*Liaison Counsel for Plaintiff Judges of the Probate Court Retirement Fund of Georgia*

Thomas Curry (*Pro hac vice application to be filed*)
**SAXENA WHITE P.A.**
824 N. Market Street, Suite 1003
Wilmington, Delaware 19801
Telephone: (302) 485-0483
Email: tcurry@saxenawhite.com

David Wales (*Pro hac vice application to be filed*)
Joshua Nelson (*Pro hac vice application to be filed*)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, New York 10606
Telephone: (914) 437-8551
Email: dwales@saxenawhite.com
Email: jnelson@saxenawhite.com

– and –

Adam Warden (*Pro hac vice application to be filed*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399
Email: awarden@saxenawhite.com

*Attorneys for Judges of the Probate Court Retirement Fund of Georgia*